## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| IN RE: | C/A No. 23-00438-EG |
| AnthymTV Co., | Chapter 7 (Involuntary Petition) |
| Debtor(s). | **ORDER DETERMINING VENUE PURSUANT TO FED. R. BANKR. P. 1014(B)** |

**THIS MATTER** is before the Court on the Motion To Determine Venue Is Proper In the District of South Carolina (the "Motion") filed by petitioning creditors, W. Reid Sanders Sr., W. Reid Sanders Jr., Doug Edwards, and Michael O'Keefe (collectively, "Petitioners").[1] Petitioners commenced this involuntary Chapter 7 bankruptcy case against AnthymTV Co. ("Debtor") pursuant to 11 U.S.C. § 303 on February 15, 2023 (the "Involuntary Case"). On March 3, 2023, the Debtor commenced a voluntary Chapter 11 case in the Bankruptcy Court for the District of Massachusetts (the "Voluntary Case"). Through the Motion, Petitioners seek an order of the Court determining that venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1408 and Fed. R. Bankr. P. 1014(b) and further request that the Court exercise its authority under Rule 1014(b)[2] to consolidate the Involuntary Case and the Voluntary Case.

Debtor filed a response to the Motion on March 14, 2023, and an evidentiary hearing was conducted on March 21, 2023. Debtor appeared at the hearing through its Chief Executive Officer, Nicholas Cartier ("Cartier"), and the Petitioners appeared through their representative, W. Reid Sanders Jr. ("Sanders"). Petitioners presented the testimony of Sanders in support of the Motion and Debtor presented the testimony of Cartier in opposition. Both parties introduced a total of 63

---

[1] ECF No. 28, filed Mar. 9, 2023.
[2] While Petitioners cite Rule 1014(b) for this requested relief, it appears that they may have been referring to Fed. R. Bankr. P. 1015(a).

exhibits into evidence, including copies of Debtor's business records, tax returns, bank account statements, rental agreements, invoices and receipts, emails and other correspondence, all of which were admitted without objection. The Court further took judicial notice of the bankruptcy courts' dockets in both the Involuntary Case and the Voluntary Case.

The contested matter before the Court raises two legal questions: (1) whether venue of the Debtor's bankruptcy cases is proper in both the District of South Carolina and the District of Massachusetts and, if so, (2) in which District it is most appropriate. While the issues themselves are straightforward, they arise in the context of a small start-up corporation with a total of three employees primarily operating online without a permanent headquarters. This set-up is not uncommon in the post-pandemic work environment our society has gravitated towards, but when such facts are presented before the Court, it renders the analysis of where a company's principal place of business or principal assets are located for purposes of venue determination pursuant to Title 28 of the United States Code and the Federal Rules of Bankruptcy Procedure factually intensive and overall more challenging. After considering the pleadings filed, the evidence presented and admitted into the record, and the arguments of the parties, the Court has determined that Debtor's bankruptcy proceedings shall proceed in the Bankruptcy Court for the District of South Carolina.

## **FACTUAL BACKGROUND**

Debtor is a corporation formed and existing under the laws of the State of Delaware since January of 2019 and is in the business of (i) operating a streaming platform through an application for connected TV devices; (ii) producing original entertainment media, primarily geared toward reality television capturing the work of first responders such as paramedics and law enforcement; and (iii) providing managed services on behalf of other publishers and content creators. Cartier,

who currently serves as Debtor's Chief Executive Officer and has done so since the company's

inception, is the holder of 81% of Debtor's outstanding equity shares. Sanders, one of the

Petitioners, owns approximately 18% of the Debtor's equity shares, with the remaining 1% being

held by a third party.[3] Sanders served as Debtor's Chief Financial Officer from April 2020 until

November 9, 2022, when he resigned as a result of a deteriorating working relationship with

Cartier.

### I.    Debtor's Initial Connections to Massachusetts

Debtor's founder, Cartier, was living in Los Angeles, California when he came up with the

idea for Debtor's business and formed the company.[4] Cartier began setting up Debtor's business

in early 2019 from a guest cottage located at his sister's residence at 10 Cottage Street, Wellesley,

Massachusetts ("Cottage Street Address").[5] At the time of its formation as a start-up, Debtor had

no income and no paid employees. In the summer of 2019, Cartier moved from California to the

Cottage Street Address.[6] At that time, Debtor purchased and began using two servers for the

business which were located at the Cottage Street Address. These servers continue to be housed

at that location, and Debtor has paid for internet services at that address on an ongoing basis since

September of 2020.[7] On March 1, 2020, Debtor filed an Annual Franchise Tax Report with the

State of Delaware, which reflected that Debtor's principal place of business was the Cottage Street

---

[3] With the exception of Sanders, none of the Petitioners currently own or hold any of Debtor's outstanding equity or ownership interest, nor are they currently serving or have they previously served as its officers.

[4] The Certificate of Incorporation filed with the Secretary of State for Delaware on January 15, 2019, states that the incorporator is Cartier, whose mailing address was 3705 W Pico Blvd #624, Los Angeles, California 90019. Pet'rs. Ex. 25.

[5] For example, on February 8, 2019, Debtor opened a bank account with JPMorgan Chase Bank, N.A. at what appears to be a California branch, but listed its business address on the application as the Cottage Street Address. Debtor's Ex. G.

[6] According to Sanders' testimony, Cartier resided in New York City from the fall of 2019 through early 2020.

[7] Debtor's Ex. E.

Address. Debtor, however, did not register its business in Massachusetts or obtain a business license to operate in Massachusetts at that time nor did it have a registered agent in Massachusetts.

On April 3, 2020, Debtor hired Sanders, who worked remotely from his residence in Charlotte, North Carolina, as its Chief Financial Officer.  On April 15, 2020, Debtor filed a Form W-9 Request for Taxpayer Identification and Certification which also reflected that Debtor's address was the Cottage Street Address. In late 2020, Cartier and Sanders began discussing where to locate Debtor's business.  After considering other options, including Nashville, Tennessee and Charlotte, North Carolina, they decided to move Debtor's operations to Charleston, South Carolina due to its burgeoning tech scene and because of the business contacts they had in that area.

## II.    Debtor's Operations in South Carolina

In January of 2021, Debtor moved its operations and took steps to legitimize its operations in South Carolina and establish its headquarters in Charleston, South Carolina.  Cartier executed a residential rental agreement on January 13, 2021 to lease property at 268 Rutledge Avenue, Charleston, SC ("Rutledge Address") from January 23, 2021 through July 30, 2021.[8]  Debtor's employees worked out of the Rutledge Address's dining room, which was converted into a conference room with workstations surrounding a conference table.  On or about February 5, 2021, Debtor filed an application to transact business as a foreign corporation with the South Carolina Secretary of State. The application reflected the address of the principal office of the corporation as the Rutledge Address.[9] On February 11, 2021, the City of Charleston issued a business license to Debtor, which also listed the Rutledge Address as Debtor's business address.[10] In March of 2021, Debtor hired a third employee, Patton Orr ("Orr"), who was responsible for developing

---

[8] This lease, which was executed on or about January 13, 2021, was subsequently extended through November of 2021. Pet'rs. Ex. 16.
[9] Pet'rs. Ex. 26.
[10] Pet'rs. Ex. 18.

original content for the Debtor and maintaining the servers in both South Carolina and Massachusetts[11] and the content streams. He was employed by Debtor on a full-time basis until February of 2023, when his position was terminated as a result of Cartier's decision to begin winding up Debtor's business. Orr also worked in Charleston and maintained a residence there from March of 2021 to February 2023.

During the time period Cartier leased the Rutledge Address, Debtor's employees primarily worked in person from that address. Debtor shared its office space at the Rutledge Address with another company, FENX Digital LLC ("FENX"). The Debtor and FENX executed a Two-Way Nondisclosure Agreement ("NDA") on April 12, 2021, which contemplated that "[a]ny disputes between the parties arising out of or relating to this NDA shall be heard in a court of competent jurisdiction located in South Carolina, as the primary place of business for both AnthymTV and FENX."[12] As further evidence of Debtor's intent to have its principal place of business in Charleston, on August 16, 2021, Debtor sent a mid-year update to its investors, signed by Cartier and Sanders, which stated: "The establishment of our headquarters in Charleston and return to in-person work has been a success, facilitating brainstorming and product innovation…. If you find yourself in Charleston, we would be pleased to give you an update on AnthymTV in person."[13]

In October of 2021, Debtor began seeking membership with the South Carolina Research Authority ("SCRA"), which offers mentorship and grants to startup companies in South Carolina that are advancing technologies in life sciences, advanced manufacturing, and information technology. In an email from Sanders to SCRA Operations Manager, Molly Copple, Sanders

---

[11] Sanders testified that Orr maintained the servers in Massachusetts remotely from Charleston. When the servers required in-person service, either Cartier would travel to Massachusetts to service them or his brother-in-law would perform whatever service was necessary.
[12] Pet'rs. Exhibit 17, ¶ 9. The NDA is signed by Cartier, Sanders, and Orr on behalf of Debtor, and by Kevin Fleming and Tucker Reilly on behalf of FENX.
[13] Pet'rs. Ex. 21.

stated that "[p]rograms/grants like yours are a big reason we decided to move our HQ [headquarters] from California to South Carolina."[14] Cartier confirmed by later email to Ms. Copple that "[w]e're applying to SCRA to bring tech jobs to the state of South Carolina which aligns with your mission."[15]

Sometime in the fall of 2021, Debtor ceased operating out of the Rutledge Address and began using the 116 South Battery, Charleston, SC 29401 ("South Battery Address") as its business address, which is Sander's personal residence.[16] From November of 2021 and throughout 2022, Debtor's employees primarily worked remotely from their personal residences[17] and would meet at the South Battery Address, restaurants, and coffee shops in Charleston, SC when in-person meetings were required. Debtor's business was primarily conducted online, and according to Cartier, Charleston was used as its "meeting hub." On June 27, 2022, the City of Charleston, SC, reissued a business license to Debtor, which listed the South Battery Address as Debtor's business address.

Debtor filed a South Carolina C Corporation Income Tax Return for 2020 and 2021. Debtor's "Annual Report to be Completed By All Corporations," dated December 2, 2022—a document required to be submitted as part of the corporate income tax return—also lists Debtor's principal office address as the South Battery Address. It further indicates that Debtor's assets of "Machinery and Equipment", valued at $13,671.00, were located in South Carolina. On June 29,

---

[14] Pet'rs. Ex. 20, p.2. Email sent by Sanders to Molly Copple (with copy to Cartier *et al*.) on December 6, 2021.

[15] Pet'rs. Ex. 20, p.1. Email sent by Cartier to Molly Copple (with copy to Sanders *et al*.) on December 7, 2021.

[16] Sanders has been a resident of the South Battery Address from May of 2021 to the present. On July 21, 2021, Cartier sent an email to Sanders stating that "it's time to reorganize a few things for Anthym's success going forward in Charleston." He stated, "I think S. Battery makes the most sense for Anthym's office location." This email indicates that Cartier anticipated that Orr would be moving to the new office location at the South Battery Address. Pet'rs. Ex. 19.

[17] Both Sanders and Orr were working from their residences in Charleston, SC. Cartier did not have a residence in Charleston from November 21, 2021 until the summer of 2022. Cartier testified that he lived at the Cottage Street Address during this time period, with the exception of two weeks in January of 2022, when he rented a house in Park City, Utah, for vacation.

2022, Cartier entered into a residential rental agreement for property located at 41 Spring Street, Charleston, SC 29403 (the "Spring Street Address") with a lease term from July 14, 2022 through July 31, 2023.

In early November of 2022, Sanders resigned as CFO. Thereafter, Debtor's business mailing address was changed to 78 Folly Road Ste B9 1298, Charleston, SC 29407 (the "Folly Road Address"), as reflected on its bank statements for November 1, 2022 through January 31, 2023.[18] From November 10, 2022 through the first week of February of 2023, Cartier and Orr continued to work as employees of Debtor, conduct in-person meetings, and work remotely from their residences in Charleston, SC.[19]

On January 3, 2023, Cartier advised the Charleston Tech Center by email, where Debtor was storing some of its servers in Charleston, that it would be moving its server out of the Tech Center. Cartier testified that the server, which apparently had been "offline" beginning in December of 2022, was moved to Massachusetts sometime during the first week of January, 2023. On February 3, 2023, Cartier notified the investors that Debtor intended to initiate an orderly closure of the business due to insufficient funds. As a result, sometime during the first week of February, Cartier also terminated Orr's employment. On March 8, 2023, Cartier requested termination of his lease for the Spring Street Address.[20]

---

[18] Pet'rs. Ex. 33. Cartier testified that this address was a post office box that was only in use for approximately two weeks.

[19] Debtor's Ex. V. Internal Slack communications dated December 13, 2022 between Cartier and Orr planning a meeting on December 14, 2022. Cartier testified that following Sanders' resignation in early November of 2022, he instructed Orr that it would be "business as usual" going forward. Cartier testified that Orr worked remotely from his parent's home in Memphis, TN for most of December and the beginning of January of 2022. However, it does not appear from the record that Orr had decided to relocate from Charleston to Memphis at that time. Instead, the evidence indicates Orr was working from his parent's house while he visited for the holidays. Cartier similarly traveled to Massachusetts from December 20, 2022 through January 5, 2023, but appears to have been in Charleston for 19 days in January of 2023.

[20] Debtor's Ex. T. The response from the leasing management company indicated that Cartier remained liable for rental payments until a new tenant was found. It is unclear from the record whether a new tenant was found.

### III.    Relocation of the Debtor's Operations to Massachusetts

Cartier testified that he began making efforts to relocate Debtor's business to Massachusetts following Sanders' resignation on or about November 10, 2022, but based on the record before the Court, it appears most of those efforts took place in January and February of 2023.  For example, Cartier testified that he moved the server to Massachusetts in early January of 2023 and changed the business mailing address for Debtor's bank accounts to the Cottage Street Address around February 1, 2023.  On March 3, 2023, at 3:42 PM—approximately seventy minutes prior to filing the Voluntary Case—Debtor filed a Foreign Corporation Certificate of Registration with the Secretary of the Commonwealth of Massachusetts to register Debtor as a foreign corporation authorized to conduct business in that state.  In that certificate, Debtor listed its registered office as 46 Center Square, East Longmeadow, MA 01028, and its registered agent as John E. Drost Jr., Esq.[21]  Cartier is listed as the current President and director of Debtor and its business address is listed as the Cottage Street Address.  Debtor opened a bank account with Eastern Bank in Wellesley, Massachusetts on March 7, 2023.[22]

### IV.    Location of Debtor's Current and Former Employees

As previously indicated, Sanders has had his primary residence at the South Battery Address from May of 2021 to present.  Orr, the third employee, lived in Charleston from at least March of 2021 to February of 2023.  Cartier, who has been Debtor's sole officer since Sanders' resignation on November 9, 2022 and the only employee since Orr's termination at the beginning of February of 2023, testified that he is a "bit of a nomad."  When Cartier began the company as a start-up in 2019, he lived in Los Angeles, CA.  In the summer of 2019, he lived at the Cottage Street Address, which is a residence owned by his sister and her husband.

---

[21] Pet'rs. Ex. 36.
[22] Debtor's Ex. W.

According to Sanders, who was friends with Cartier during that time, Cartier then lived in New York City from the fall of 2019 through early 2020. Cartier testified that he was living at the Cottage Street Address during 2020. From January of 2021 through November of 2021, he lived at the Rutledge Address, where Debtor's headquarters was also located. From December of 2021 until July of 2022, it appears that Cartier lived at the Cottage Street Address and traveled back and forth between South Carolina and Massachusetts, except for two weeks in January of 2022 when he rented a house in Park City, Utah. In July of 2022, Cartier leased the Spring Street Address, where he appears to have lived until at least March of 2023.[23] Cartier presented evidence of his air travel between Charleston and Boston between September of 2021 through February of 2023, which indicated that he frequently traveled back and forth between the two cities,[24] although Cartier admitted that the record of his flights introduced into evidence was incomplete. Although Cartier testified that he spent more than half of his time in Boston during the 180 days prior to the filing of the involuntary, the flight records introduced into evidence are inconclusive.[25] Cartier currently lives at the Cottage Street Address.

## V.    Location of the Debtor's Assets

Aside from bank accounts, prepaid insurance, original programming content, some office equipment and computer equipment and servers, Debtor appears to have no other assets. Debtor

---

[23] On February 9, 2023, a process server attempted to serve Cartier at the Spring Street Address in Charleston with a Notice of Default letter, but the occupant refused to accept service, stating "I'm not opening the door." Pet'rs. Ex. 8. On February 27, 2023, Cartier was served with a copy of the summons and involuntary petition for the Involuntary Case by substitute service on his mother, Janet Cartier, at the Spring Street Address who said that Cartier "was not there and would be back in two weeks."

[24] Debtor's Ex. J. The flight record indicates that he made at least 15 trips to Boston, MA, and 15 trips to Charleston, SC, between September 10, 2021 and February 1, 2023.

[25] The flight records introduced into evidence indicate that from August 19, 2022 through February 15, 2022—the 180-day period prior to the commencement of the Involuntary Case—Cartier spent at least 84 days in Charleston and at least 41 days in Boston. Between October 10, 2022 and December 5, 2022, it is unclear how many days Cartier was in either location. The flight records show that Cartier arrived in Charleston on October 10, 2022 and departed Boston to return to Charleston on December 5, 2022, but the flight record for Cartier's flight to Boston in between those dates is missing. Debtor's Ex. J.

has at least three servers: two housed in Wellesley, Massachusetts, and at least one other most recently housed at the Charleston Tech Center in Charleston, SC until it was removed from that location sometime after January 3, 2023.[26]  Debtor's original programming content is stored on the servers located in Wellesley, Massachusetts.

### VI.    Circumstances Leading to Filing of Involuntary Petition

#### a.    Convertible Notes and Default

Debtor has no secured creditors.  Its main debt consists of amounts owed to its investors in a number of unsecured "Seed Round Convertible Subordinated Promissory Notes" (the "Convertible Notes"), executed by Debtor in 2020 as part of a capital raising effort coordinated by Sanders and Cartier.  Currently, Debtor owes approximately 25 different noteholders (the "Noteholders") a total of $837,500.00 for the Convertible Notes.  Petitioners for the Involuntary Case each hold one or more Convertible Notes, totaling $350,000.00 in value.  On their maturity date of December 31, 2022 (the "Maturity Date"), the Convertible Notes could either be paid upon demand or converted into Series A Preferred Equity in Debtor, based upon a decision of the holders of a simple majority of the Convertible Notes (the "Majority in Interest of the Noteholder Group"). On November 10, 2022, Debtor was aware that the Maturity Date of the Convertible Notes was approaching, and "to ensure that [the Debtor does not] have to rush to raise capital while . . . in a period of immense growth," Cartier suggested in an email to the investors that they consider either pushing the Maturity Date out one year—to January 1, 2024—or converting the notes into equity.[27]

On January 9, 2023, Sanders sent an email to Cartier informing him that the investors had arrived at an "overwhelming consensus" to have the Convertible Notes repaid according to their

---

[26] Sanders testified that there were 4 or 5 servers, but Cartier testified that there were only 3 and that the server in Charleston was the auxiliary server.
[27] Pet'rs Ex. 3.

terms.[28]  After receiving the January 9, 2023 email, Cartier felt like he had little choice but to wind

up the company; accordingly, he notified the Noteholders that Debtor would cease operations and

begin an orderly wind up of the company designed to maximize the remaining value for its

creditors.  On February 3, 2023, Mr. Cartier sent Noteholders a communication informing them

that Debtor "intends to initiate an orderly closure of the business due to insufficient funds."[29]  On

February 7, 2023, following Cartier's announcement of Debtor's intent to wind up the business,

counsel for the Majority in Interest of the Noteholders Group sent Cartier correspondence

informing him that they were deeming his February 3, 2023 letter to be an event of default under

the terms of the Convertible Notes, rendering them immediately due and payable.[30]  When counsel

for the Majority in Interest of the Noteholders Group attempted to serve the correspondence at

Cartier's residence at 41A Spring Street, Charleston, SC, it appears that Cartier attempted to evade

service of the correspondence.[31]

### b.    Commencement of Involuntary Case in South Carolina

Petitioners commenced the Involuntary Case on February 15, 2023 by filing the

involuntary petition in the U.S. Bankruptcy Court for the District of South Carolina. The

involuntary petition lists the Debtor's principal place of business as the Spring Street Address in

Charleston, SC.[32]  In Part 3, Item 10 of the Involuntary Petition, Petitioners checked the box

indicating that "[o]ver the last 180 days before the filing of this bankruptcy, the debtor had a

domicile, principal place of business, or principal assets in this district longer than in any other

---

[28] Pet'rs. Ex. 4.
[29]  Pet'rs. Ex. 5.
[30] Pet'rs. Ex. 7.
[31] Pet'rs. Ex. 7 (February 7, 2023 Letter to Cartier); Pet'rs. Ex. 8 (Affidavit of Attempted Service, dated February 9, 2023).  *See also supra* at n. 25.  Cartier's counsel later sent a letter to counsel for the Majority in Interest of the Noteholders Group on February 13, 2023, acknowledging receipt of their February 7, 2023 letter and further requesting that the firm "kindly refrain from tormenting my client at **his residence**."  ECF No. 15 (emphasis added), Ex. 1.
[32] ECF No. 1, filed Feb. 15, 2023.

district."  On the same day the Involuntary Petition was filed, Petitioners also filed a Motion to

Appoint an Interim Trustee pursuant to 11 U.S.C. § 303(g) and Fed. R. Bankr. P. 2001 requesting

the appointment of an interim trustee to take possession of property of the estate of the putative

debtor.[33]  Debtor filed an objection to the Motion to Appoint Interim Trustee,[34] and a hearing was

scheduled for March 7, 2023.[35]

Since the filing of the Involuntary Case, eleven Joinders to the involuntary petition were

filed by noteholders[36] pursuant to 11 U.S.C. § 303(c) (the "Joining Parties").  A review of the

addresses used by Petitioners and Joining Parties reflects that ten of these individuals reside in

Tennessee, four reside in South Carolina, and three in Florida.[37]  None of the Petitioners or Joining

Parties reside in the Commonwealth of Massachusetts.  On March 9, 2023, Debtor filed a Response

to Involuntary Chapter 7 Petition, denying that it should be an involuntary debtor in this

Involuntary Case and stating that "[a]s a result of the pending Voluntary Case and the entry of an

order for relief in the Voluntary Case, an order for relief does not need to be entered and the

Involuntary Case should be dismissed."[38]

---

[33] ECF No. 2, filed on Feb. 15, 2023.
[34] ECF No. 15, Filed. Mar. 1, 2023.
[35] ECF No. 7.
[36] ECF Nos. 11, 12, 13, 14, 17, 19, 20, 22, 23, 24, and 25.  Five of the Joining Parties are trusts, family limited partnerships, and/or limited liability companies, but the joinders are signed by their members or trustee.  Two of the LLC's joinders were signed by two members each; accordingly, thirteen individuals totaled signed the joinders to the involuntary petition.
[37] In the Motion, the Petitioners claim that "[o]f the Petitioners and Joining Parties, eight (8) reside in Tennessee, four (4) reside in Florida, four (4) reside in South Carolina, and one (1) resides in New York."  Based on a review of the involuntary petition and the Joinders as referenced herein, it is not clear how the Petitioners arrived at these figures.  Testimony presented at the hearing indicates that some of the joining petitioners were trusts, and while the trustees may have resided in Tennessee, the beneficiaries who signed the joinder resided in South Carolina.  Notwithstanding the slight discrepancy, even under Petitioners' figures, none of the noteholders who have petitioned for Debtor's involuntary bankruptcy use an address in Massachusetts.
[38] ECF No. 29, filed Mar. 9, 2023.

### c.    Commencement of Voluntary Case in Massachusetts

On the afternoon of Friday, March 3, 2023—four days before the Motion to Appoint Interim Trustee was scheduled to be heard in the U.S. Bankruptcy Court for the District of South Carolina—Debtor filed a Foreign Corporation Certificate of Registration with the Office of the Secretary of State for the Commonwealth of Massachusetts.  Approximately 72 minutes after Debtor was registered with the Secretary of State in Massachusetts, it filed a voluntary petition seeking protection under Subchapter V of Chapter 11 of the Bankruptcy Code pursuant to 11 U.S.C. § 1182 in the U.S. Bankruptcy Court for the District of Massachusetts.  *See* Voluntary Petition, Case No. 23-10324 (Bankr. D. Mass.).

The petition filed in the Voluntary Case indicates that Debtor's principal place of business is the Cottage Street Address in Massachusetts.  In Item 11 which inquires "why is the case filed in this district," Debtor checked the box indicating that "debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district."

In the Voluntary Case, Debtor filed Official Form 204 which requires Debtor to list the 20 largest unsecured claims that are not insiders.  The list includes only noteholders of Convertible Notes, and a close review reflects that of the 20 noteholders, 12 are listed as having addresses in Tennessee, two in New York, two in South Carolina, two in Florida, one in Arizona, and one in Colorado.  None of the top 20 unsecured creditors is listed as having a Massachusetts address.

### d.    Motion for Determination of Venue

At the March 7, 2023 hearing, the Court continued the Motion to Appoint Interim Trustee and entered an Order Setting Deadlines Scheduling Further Hearing Pursuant to Fed. R. Bankr. P.

1014(b) (the "Scheduling Order").[39]  The Scheduling Order set the deadline to file any motion to

determine venue and objections or responses to such motions, scheduled a hearing on any such

motion for March 21, 2023, and stayed the parties from proceeding in the Voluntary Case.  The

Scheduling Order provided, in pertinent part:

> Until the venue issue is determined by this Court, the parties are further ordered not
> to file substantive motions or seek further relief from the Bankruptcy Court in the
> District of Massachusetts in connection with the Debtor's pending bankruptcy case.
> The Debtor may continue to file any documents required by the Bankruptcy Code
> and Federal Rules of Bankruptcy Procedure in the Massachusetts Bankruptcy
> Court, including but not limited to schedules and statements, and may participate
> in administrative matters such as the initial debtor interview and the 11 U.S.C. §
> 341 meeting of creditors.

Subsequently, Petitioners filed the Motion currently before the Court, and Debtor filed an

objection.

At the hearing, Cartier testified on Debtor's behalf that the bankruptcy case should proceed

in Massachusetts due to its proximity to "vibrant media markets" in Boston and New York, which

would maximize the value of the assets, all of which are now located in Massachusetts.  Sanders

testified that the Noteholders considered Debtor's principal place of business to be Charleston,

South Carolina, a few of the Noteholders reside or have second homes in South Carolina, and the

majority of the Noteholders live in close proximity to South Carolina. Accordingly, the

Noteholders believed Debtor's bankruptcy case should proceed in South Carolina.

Petitioners further agreed at the hearing that the Motion to Appoint Interim Trustee was

moot in light of the filing of the Voluntary Case but reserved their rights to bring any motion under

11 U.S.C. § 1185 or any other applicable section of the Bankruptcy Code.  They further agreed

that the two cases would be viewed as merged or consolidated and would continue as a Chapter

---

[39] ECF No. 27, entered Mar. 7, 2023.

11, Subchapter V, with a filing date as of the commencement of the Involuntary Case, in whichever district the Court determined was the proper venue for the cases.[40]

## CONCLUSIONS OF LAW

Proper venue under 28 U.S.C. § 1408 may be established in a district where the corporation has its "principal place of business" or principal assets for the 180-day period preceding the filing. "Federal practice with respect to venue has continued to evolve to keep pace with the rapidly changing nature of our nation, from the development of interstate commerce to the rise of the corporation and national banks to the dawn of the digital age." *In re Patriot Coal Corp.*, 482 B.R. 718, 738 (Bankr. S.D.N.Y. 2012). Establishing a corporation's principal place of business for venue purposes can be difficult when raised in the context of a corporation operating a primarily online business in the post-pandemic modern work environment, where employees often work remotely from their homes or travel locations, and the company elects not to establish a permanent office or workplace. Under such circumstances, the state or states in which a debtor is registered to conduct business or has a registered agent is one of the crucial factors to consider, along with the location that the debtor publicly holds out to be the principal place where its business is conducted.

This case presents an additional hurdle: the unusual circumstance when two bankruptcy petitions are pending for the *same debtor*—one an involuntary Chapter 7 petition and one a voluntary Chapter 11 petition—in *different jurisdictions*. Federal Rule of Bankruptcy Procedure 1014(b) addresses the situation and provides:

**Procedure when petitions involving the same debtor or related debtors are filed in different courts**
If petitions commencing case under the Code . . . are filed in different districts by, regarding, or against (1) the same debtor . . . . the court in the district in which

[40] This would be consistent with the Court's holding in *In re Premier Gen. Holdings, Ltd.*, 427 B.R. 592 (Bankr. W.D. Tex. 2010).

15

> the first-filed petition is pending may determine, in the interest of justice or for the convenience of the parties, the district or districts in which any of the cases should proceed.  The court may so determine on motion and after a hearing, with notice . . . .  The court may order the parties to the later-filed cases not to proceed further until it makes the determination.

Fed. R. Bankr. P. 1014(b).    Because the involuntary petition was the first-filed petition commencing the Involuntary Case, this Court must decide where the two cases should proceed.  *See, e.g.*, *In re Hermitage Inn Real Estate Holding Co*., No. 19-10214, 2019 WL 2536075, at *3 (Bankr. D. Vt. Jun. 19, 2019) ("*Hermitage*") (Vermont bankruptcy court, where an involuntary proceeding was commenced against a debtor, decided that all the related debtor cases should proceed in Vermont rather than Connecticut, where the affiliated debtors filed a subsequent voluntary petition); *In re Caesars Entm't Operating Co*., No. 15-10047, 2015 WL 495259, at *1 (Bankr. D. Del. Feb. 2, 2015) ("*Caesars*") (Delaware court in which an involuntary petition was commenced determined, pursuant to Fed. R. Bankr. P. 1014(b), that the debtor's bankruptcy proceeding should proceed in Illinois where the debtor and certain of its affiliates had commenced voluntary bankruptcy proceeding three days after the involuntary case commenced); *In re Innovative Comm. Co*., 358 B.R. 120, 129 (Bankr. D. Del. 2006) (after involuntary Chapter 11 cases were filed against three debtors in Delaware, and the debtors subsequently filed voluntary Chapter 11 cases in the Virgin Islands, Delaware court held that venue in the Virgin Islands was appropriate and best satisfied the interests of justice).  At the hearing on the Motion, the Court received several hours of testimony from two witnesses regarding Debtor's operations and activities in South Carolina and Massachusetts, as well as more than sixty exhibits comprised of corporate records, bank accounts, email correspondence, tax returns, lease agreements, and other pertinent documents.  After a careful analysis of the record before it and the statutory and legal authority, the Court concludes that venue is proper in South Carolina.

I.     **Burden of Proof for Determination of Venue Pursuant to Fed. R. Bankr. P. 1014(b)**

As a preliminary matter, it is not entirely clear from the language of Fed. R. Bankr. P. 1014(b) which party bears the burden of proof on the venue determination.  In situations where a party in interest moves to transfer venue of a voluntary bankruptcy case pursuant to 28 U.S.C. § 1412, the burden usually falls on the movant to demonstrate, by a preponderance of the evidence, that the case should be transferred to a different venue in the interest of justice or for the convenience of the parties.  *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019) (noting that a debtor's choice of forum is presumed to be the proper district for venue purposes and the party challenging the debtor's choice of venue bears the burden of proof by preponderance of the evidence); *In re Baltimore Food Sys., Inc.*, 71 B.R. 795 (Bankr. D.S.C. 1986) (holding that the moving party bears the burden to demonstrate that venue is improper); *see also Hermitage*, 2015 WL 495259, at *4 (citing *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002)).

Petitioners contend that in an involuntary bankruptcy case, the petitioning creditors have the initial burden to prove that venue is proper in the district where the involuntary was filed pursuant to 28 U.S.C. § 1408; but once that initial burden is met, the party seeking to have the case adjudicated in a different district—here, Debtor—bears the burden to prove that transfer of the case to that court is in the interest of justice or for the convenience of the parties.  At the hearing, the Debtor agreed that it bears the burden to demonstrate that the interests of justice and convenience of parties support transfer of venue to Massachusetts.[41]  Accordingly, the Court finds that Petitioners bear the initial burden to prove that South Carolina is a proper venue for filing of the involuntary proceeding and, if the Court finds that venue is proper in both South Carolina and

---

[41] Debtor's counsel acknowledged that she did not file a motion to transfer venue because the parties had agreed that Petitioners would file the motion to determine whether venue is proper in this district.

Massachusetts pursuant to 28 U.S.C. § 1408, then the burden shifts to Debtor to demonstrate that venue of the cases in Massachusetts is in the interest of justice and the convenience of the parties. "If the evidence does not weigh decidedly in either party's favor, the debtor's choice of forum is entitled to deference." *In re Lawrence & Assoc., LLC*, No. 08-02655, 2009 WL 1940561, at *4 (Bankr. D. Idaho Jul. 2, 2009) (citing cases); *In re Bestwall LLC*, 605 B.R. at 51 (stating that "[s]ubstantial weight and deference" is given to a debtor's choice of forum when considering whether to transfer venue).

## II.  Venue Is Proper in South Carolina Under 28 U.S.C. § 1408

Debtor disputes that venue is proper in South Carolina because once Sanders resigned as CFO on November 10, 2022, that marked the end point and termination of all Debtor's ties to South Carolina and further claims that as of March 14, 2023—the date of the Response Debtor filed to the Motion,  Debtor no longer had any operations of any kind in South Carolina; no longer had any employees, assets, or offices located in South Carolina; and all assets, operations, and the sole employee are in Massachusetts.

Venue for bankruptcy cases is governed by 28 U.S.C. § 1408, which provides:

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408. Section 1408(1) provides four alternative tests for determining the proper venue of a bankruptcy case—any one of which is sufficient to establish venue if met. *See In re Dunmore Homes, Inc.*, 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008) ("The statute is written in the disjunctive making venue proper in any of the listed locations."); *see also* 1 COLLIER ON BANKRUPTCY ¶ 4.02 (16th ed. 2023) ("Any one of the four is sufficient: 'the statute allows many possible locations where an entity or individual may file for bankruptcy protection.'").

For a corporation, the "domicile" is generally held to be its state of incorporation. *In re Cosmogony II, Inc.*, No. 22-01682, 2022 WL 14929826, at *5 (Bankr. D.P.R. Oct. 25, 2022). Here, the Debtor was incorporated in Delaware, which is not one of the venue choices sought by the parties. Accordingly, the analysis turns on the place in which Debtor's "principal place of business" or "principal assets" have been located for the 180 days preceding the filing of the Involuntary Case. The parties agree that the applicable time period in this case runs from August 19, 2022, to February 14, 2023—the date "immediately preceding" the commencement of the Involuntary Case (the "Venue Period").

Courts tasked with determining where a debtor's principal place of business is located employ the "nerve center" test. *In re Baltimore Food, Sys. Inc.*, 71 B.R. 795, 800-01 (Bankr. D.S.C. 1986) (finding that venue was proper in the District of South Carolina, where the sole chief executive, operating and financial officer of reorganized debtor, and his staff, were located). In the case of *Hertz Corp v. Friend*, the Supreme Court analyzed the issue of a corporation's "principal place of business" pursuant to 28 U.S.C. § 1332(c)(1)—the federal diversity jurisdiction statute—which provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business*." 559 U.S. 77, 80 (2010). The Supreme Court went on to note:

"[P]rincipal place of business" is best read as referring to the place where the corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.* the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.; see also In re Peachtree Lane Assocs.*, 198 B.R 272, 283 (Bankr. N.D. Ill. 1996), *aff'd* 206 B.R. 913 (N.D. Ill. 1997), *aff'd* 150 F.3d 788 (7th Cir. 1998) (holding that the debtor's principal place of business was in the Northern District of Illinois because the debtor's significant business decisions were made by its executives who had offices in Chicago and Long Grove, Illinois, notwithstanding that the debtor's asset, an apartment complex, was located in Texas, or that the debtor's property manager for the complex was located in California). Given the use of almost identical language between §§ 1332(c)(1) and 1408(1), the Supreme Court's logic in *Hertz* would similarly apply to bankruptcy cases. *See In re Grand Dakota Partners, LLC*, 573 B.R. 197 (Bankr. E.D.N.C. 2017) (applying *Hertz* definition of "principal place of business" in the context of a 28 U.S.C. § 1408 venue determination).

Debtor has been registered to do business in South Carolina since 2021. Debtor renewed its City of Charleston business license registration for the 2022-2023 period on June 27, 2022. The evidence presented indicates that while Debtor quickly took steps to register and obtain a business license when it first located the business in Charleston in the beginning of 2021,[42] Debtor did not take similar steps to formalize operations in Massachusetts until March 3, 2023—at the eleventh hour immediately prior to filing the Voluntary Case. Moreover, it was not until March 3, 2023 that Debtor first established a registered agent for service of process in Massachusetts. Notably, a

---

[42] Pet'rs. Ex. 26 (Application by a Foreign Corporation for a Certificate of Authority to Transact Business in the State of South Carolina, filed February 5, 2021).

corporation's failure to register to do business in a state is non-dispositive evidence regarding the location of a corporation's principal place of business. *Sebastian Holdings, Inc. v. Kugler*, No. 3:08-CV-1131 RNC, 2012 WL 1190837, at *5 (D. Conn. Mar. 30, 2012) (stating that while not determinative, a company's failure to register in a particular state provides some evidence that this state is not its principal place of business).

On the other hand, Petitioners presented evidence that Debtor represented that its headquarters was in Charleston, South Carolina, in a non-disclosure agreement with FENX executed on April 12, 2021, in an email to its investors sent on August 16, 2021 providing a mid-year update, in emails sent in late 2021 to the South Carolina Research Authority seeking membership and benefits as a startup company located in South Carolina; and in its South Carolina tax returns for 2020 and 2021 (the latest bearing a date of December 2, 2022).[43]  There is no evidence of Debtor representing any other location as its headquarters.  Furthermore, all three Debtor's employees maintained residences or abodes in Charleston from August 19, 2022 through November 10, 2022 of the Venue Period, when Sanders resigned, and its remaining employees, Cartier and Orr, maintained abodes in Charleston for the remainder of the Venue Period.[44]

Despite Cartier's testimony that he intended the company to primarily operate out of Massachusetts since 2019 and that Charleston was merely a "satellite" location, no evidence was introduced indicating that Debtor ever filed a Massachusetts tax return or registered to do business in Massachusetts prior to March 3, 2023.  Other than Cartier's testimony, which the Court finds is self-serving, no evidence was presented indicating that Cartier was making significant business

---

[43] Debtor urges the Court to ignore Debtor's activities in South Carolina prior to August of 2022, arguing that they are not relevant to the determination of venue since they occurred prior to the Venue Period.  However, "history plays a role" in a venue determination, among other things. *In re Lawrence & Assoc., LLC*, 2009 WL 1940561, at *7.

[44] Cartier's testimony that during the latter part of December and beginning of January he was working from his sister's house in Massachusetts and Orr was working from his parent's house in Tennessee does not convince the Court that the "nerve center" changed during this time period.  It is not unusual for employees to travel to and work from other locations during the holiday season while they visit family.

decisions for Debtor primarily from the 10 Cottage Street Address during the Venue Period. Nothing in the record indicates that Debtor's corporate activities were directed, controlled, or coordinated from Massachusetts. Charleston, however, appears to have been the "nerve center" of Debtor during the Venue Period. *Hertz Corp v. Friend*, 559 U.S. at 80 (finding that a corporation's principal place of business is its "nerve center" where its officers direct, control, and coordinate the corporation's activities); *In re Peachtree Lane Assocs.*, 198 B.R. at 281 (finding that the "nerve center" test tasks the Court with determining where the debtor's significant business decisions are made).

The evidence reflects that Cartier was making significant business decisions as CEO of Debtor from Charleston during this time. When Cartier emailed investors on November 10, 2023, to provide an update on Debtor's operations and request an extension of the due dates on the Convertible Notes, it appears that he was in Charleston at that time.[45] When Cartier acknowledged receipt on January 11, 2023 of the email sent by Sanders on January 9, 2023 informing Debtor that the Noteholders intended to seek repayment of the balance of the notes if Debtor was unable to find alternate financing, Cartier's flight records indicate that he was in Charleston at that time.[46] In addition, it appears Cartier was also in Charleston when he made the significant business decision to wind up the company on February 3, 2023.[47] The fact that Cartier thereafter voluntarily elected to relocate Debtor's operations to Massachusetts to complete the winding up of the

---

[45] Cartier testified that *after* November 10, 2022, he began spending the majority of his time at the Cottage Street Address. He testified that he had an in-person meeting scheduled with Sanders on November 10, 2022, which Sanders abruptly canceled, and then sent the email twenty minutes later on November 10, 2022 to the investors notifying them of his resignation. Since Sanders testified that he was a resident of Charleston at that time and both Sanders and Cartier testified that Charleston was the meeting hub for Debtor, it appears that the meeting would have taken place in Charleston. Cartier did not indicate that the meeting was scheduled to take place in Massachusetts.

[46] Debtor's Ex. J, p. 3. The flight records indicate that Cartier arrived in Charleston on January 5, 2023 and traveled to Boston on January 24, 2023.

[47] Debtor's Ex. J, p. 3. The flight records indicate that he traveled to Charleston from Boston on February 1, 2023. There is no record of a flight to Boston after February 1, 2023.

business does not establish a connection with Massachusetts that is more significant than Debtor's connection with South Carolina.

Based on the evidence presented, the Court finds that Debtor's principal place of business for the greater portion of the Venue Period was Charleston, South Carolina. Accordingly, venue is proper in South Carolina.

### III.    Venue Is Also Proper in Massachusetts Under 28 U.S.C. § 1408

The Court further finds that venue is also proper in Massachusetts based on the location of Debtor's primary assets, its two servers which store the original programming content and streaming platform,[48] at the Cottage Street Address in Massachusetts during the Venue Period. 28 U.S.C. § 1408 (providing that venue is proper where the principal assets of the entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement). When venue is proper in both districts, the Court where the first-filed petition is pending is authorized to determine where the case should proceed considering the interests of justice and convenience of the parties pursuant to Fed. R. Bankr. P. 1014(b).

### IV.    The Convenience of the Parties Supports Venue in South Carolina

Even if venue is proper in both South Carolina and Massachusetts because Debtor's principal place of business operations and assets are located in the two states, respectively, the Court finds that convenience of the parties weighs in favor of venue in South Carolina.

---

[48] The Court notes that Debtor's most valuable assets appear to be the content stored on the servers and its streaming platform, which appear to be intangible property. The Supreme Court has stated that intangible property is "not physical matter which can be located on a map." *Delaware v. New York*, 50 U.S. 490, 498 (1993). The content on these servers can be accessed remotely and can be moved to any location with reliable internet access. Since the Court concludes that the convenience of the parties and interests of justice support venue in South Carolina, it is unnecessary to determine the location of the intangible property at this time as it would not alter the Court's conclusion. Moreover, Petitioners did not put on a strong case to prove that the principal place of assets was South Carolina and disprove Debtor's assertions that its principal assets was the main server located in Massachusetts. For purposes of this Order, the Court finds that Debtor's principal assets appear to have been located in Massachusetts during the Venue Period.

As set forth above, Rule 1014(b) controls the procedure for when petitions involving the same debtor are pending in different courts and mentions that in determining the district in which the case should proceed, the court may consider the "interest of justice or the convenience of the parties."  Similarly, 28 U.S.C. § 1412 provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  When discerning the convenience of the parties for purposes of transfer of venue under 28 U.S.C. § 1412 and Rule 1014(b), courts look to the six factors considered by the court in *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979) ("CORCO"):

(1) the proximity of creditors of every kind to the Court;
(2) the proximity of the debtor to the Court;
(3) the proximity of witnesses necessary to the administration of the estate;
(4) the location of the assets;
(5) the economic and efficient administration of the estate; and
(6) the necessity for ancillary administration if liquidation should result.

"The Court must exercise its discretion in weighing and evaluating these factors, and certain factors may be deemed more important than others."  *In re Lawrence & Assoc., LLC*, No. 08-02655, 2009 WL 1940561, at *5 (Bankr. D. Idaho Jul. 2, 2009) (citing *TVI, Inc. v. Russo III (In re Russo III)*, No. 01-6330, 2002 WL 33939735, at *3 (Bankr. D. Idaho Apr. 19, 2002)).

The Court examines each of these factors as follows:

**a.  *Proximity of Creditors***

None of the Petitioning Creditors resides in Massachusetts.  None of the creditors listed on the Official Form 204 "Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders" filed by Debtor on March 3, 2023 in the Voluntary Case resides in Massachusetts.[49]  The majority of Debtor's creditors are located in either South Carolina

---

[49] Petitioners' Exhibit 39 (Official Form 204, filed March 3, 2023 in Case No. 23-10324).

or in close proximity to South Carolina. Most of the Petitioners, Joining Parties, and Noteholders are from Tennessee or Florida, which are geographically closer to South Carolina than Boston, Massachusetts. One of Debtor's creditors, who resides in New York, has filed a joinder to the Involuntary Case. Debtor has no secured creditors located in either venue. This factor weighs in favor of venue in South Carolina.

### b. *Proximity of Debtor and Location of its Assets*

As concluded above, Debtor's principal place of business was South Carolina during the Venue Period. Debtor has since moved its operations to Massachusetts and now seeks to continue its Voluntary Case in that forum. Debtor's preference of forum is entitled to due consideration. *Hermitage*, 2019 WL 2536075, at *5 (citing *In re Patriot Coal Corp.*, 482 B.R. 718, 739 (Bankr. S.D.N.Y. 2012)) (stating that deference is normally given to the debtor's choice of forum when venue is proper). "[A]ssessment of proper venue under Bankruptcy Rule 1014(b) involves a determination of the degree of deference that should be afforded the debtor's choice of forum and whether the opposing party, be it creditors, trustee, or U.S. trustee, has proffered enough evidence to overcome that deference, and sufficiently demonstrated that the 'interest of justice' or 'convenience of the parties' analysis favors their chosen forum." *Hermitage*, 2019 WL 2536075, at *5. "If the evidence does not 'weigh decidedly in either party's favor, the debtor's choice of forum in filing the underlying bankruptcy case is entitled to deference.'" *In re Lawrence & Assoc., LLC,* 2009 WL 1940561, at *4.

In cases where an involuntary petition was filed against the debtor in a different venue than the venue where the debtor later filed its voluntary petition, courts have been unwilling to disregard the debtor's choice of venue when it was apparent that the involuntary petition was filed as a preemptive strike in anticipation of the debtor filing in another forum. *See, e.g., Caesars*, 2015

25

WL 495259, at *4.  In this case, while it was fair for Noteholders to possibly assume that Debtor was contemplating a bankruptcy filing, based on the correspondence they received from Cartier in early February of 2023 advising them of Debtor's intention to wind-down the business, nothing in the record indicates that the Noteholders had any inkling that any such possible filing would take place in Massachusetts.  Moreover, there is no evidence that the Petitioners' filing in South Carolina was to gain a strategic advantage.  Instead, it appears that Debtor took steps to manufacture venue in Massachusetts by filing a Foreign Corporation Certificate of Registration on March 3, 2023 at 3:42 P.M., approximately 70 minutes prior to filing the Voluntary Case at 4:54 P.M. that same day.  This conduct is indicative of unfair forum shopping.[50]  *See In re Patriot Coal Corp*, 482 B.R. at 738.

Cartier testified that Massachusetts was the best venue for Debtor's bankruptcy case to proceed because of its proximity to media markets in Boston and New York, where he had established contacts, which would maximize the value of the assets, all of which are now located in Massachusetts.  Debtor has filed a Subchapter V Chapter 11 case in Massachusetts seeking to reorganize its debts.  Therefore, maximizing the value of the assets for the creditors is less relevant than it would be in a liquidation.  *In re Caesars Enter. Operating Co.,* 2015 WL 495259, at *6 ("The location of assets is not as important where the ultimate goal is rehabilitation rather than liquidation.") (citing cases).  Even if any future plan is to contemplate a sale of substantially all of Debtor's assets, the Court is not persuaded by Debtor's arguments that keeping the case in Massachusetts would maximize their value.  Debtor's other assets, such as its bank accounts and books and records, appear to be electronically accessible from anywhere.  There are no real estate

---

[50] Debtor argues that this is not a case of forum shopping because Cartier is simply continuing the operations of Debtor in Massachusetts that have been ongoing since 2019.  The Court did not find convincing Cartier's testimony that Massachusetts was always intended to be the principal place of business for Debtor.  This testimony was contradicted by several communications where Cartier represented that Debtor's headquarters was in Charleston.

holdings in Massachusetts that would warrant special consideration to be administered from their location. *See In re Baltimore Food Sys., Inc.*, 71 B.R. at 803 (finding that no emphasis upon local concerns needed to be given where assets are not real estate holdings).

It appears that Debtor's desire for this case to proceed in Massachusetts is primarily motivated by Cartier's own personal convenience while inconveniencing other parties.[51] As a self-proclaimed "nomad" who has frequently traveled back and forth between Massachusetts and South Carolina over the past two years, it does not appear overly burdensome to Cartier, as the sole employee and representative of Debtor, to be required to travel to South Carolina, where Debtor conducted business for an extended period of time, when necessary for matters in connection with the administration of its bankruptcy case.[52]  Debtor already has bankruptcy counsel in South Carolina, who is familiar with Debtor's historical operations and financial circumstances. The Court concludes that the location of Debtor and its assets in Massachusetts are not determinative factors.

### c. *Proximity of Witnesses*

With the exception of Cartier, all potential witnesses, including Debtor's former employees—Sanders and Orr—appear to be located in South Carolina or in closer proximity to South Carolina. The majority of Debtor's unsecured creditors, which appear to be comprised entirely by Noteholders, by number and amount of their claims, reside in South Carolina or in closer proximity to South Carolina.  Many of Debtor's creditors have indicated their support for this case proceeding in South Carolina by filing joinders to the involuntary petition.  Cartier is the

---

[51] It was evident from the testimony of Cartier and Sanders that their working and personal relationship had soured and Cartier was frustrated by Sanders' "surprise" resignation and his subsequent communications with the Noteholders.

[52] As a result of videoconferencing capabilities offered by the Court, it is often unnecessary for out-of-state parties to appear in person for hearings.

sole representative of Debtor, appears to live in Massachusetts *at this time*,[53] and would likely be a necessary witness.  However, for the reasons stated above, the Court finds that Cartier's proximity to the court should not be given significant weight in this analysis.  The Court concludes that this factor weighs in favor of venue in South Carolina but notes that "physical location of witnesses is not as important a consideration as the other CORCO factors."  *See In re Hermitage Inn Real Estate Holding Co, LLC*, 2019 WL 2536075, at *10 (quoting *In re B.L. of Miami, Inc.*, 294 B.R. 325, 332 (Bankr. D. Nev. 2003)).

### d.  *Economic and Efficient Administration of the Estate*

Whether a particular location would promote the most economic and efficient administration of the estate is generally considered to be the most important factor in the venue analysis.  *See Hermitage*, 2019 WL 2536075, at *12.  Petitioners argue that administering the bankruptcy case in Massachusetts will result in additional costs for Debtor's creditors because they will be required to hire counsel in Massachusetts and they have already retained South Carolina counsel.  Debtor has already retained South Carolina counsel, who appears to be well-informed regarding Debtor's assets, liabilities, and historical operations.  The success of Debtor's reorganization could likely depend on negotiations with the Noteholders, who have indicated their preference to proceed in South Carolina, and Debtor's ability to obtain post-petition financing.  There is no reason to believe that Massachusetts is the only state where post-petition financing would be available to Debtor.

While no interim trustee has been appointed in South Carolina, a Subchapter V Trustee has been appointed in Massachusetts.  However, considering the short duration of the Voluntary Case

---

[53] There is no evidence before the Court that Cartier owns or leases property in Massachusetts, and he is presently living at his sister's guest house.

and this Court's order staying further proceedings in the Voluntary Case, it is unlikely that the Subchapter V Trustee has incurred significant costs thus far.

As a result of this Motion, this Court has received several hours of testimony regarding the historical business operations of the Debtor and reviewed numerous exhibits relating to Debtor's operations. While there has been a relatively short period of time between the filing of the Involuntary Case in South Carolina and the Voluntary Case in Massachusetts, a considerable amount of information has been provided to this Court during this time regarding Debtor and its operations. Accordingly, it appears that allowing the bankruptcy cases to proceed in this Court would be more efficient and would promote judicial economy. *See In re Rest. Acquisition I, LLC*, 2016 WL 855089 (Bankr. D. Del. 2016) (finding that the learning curve weighed against transfer where the court had spent significant time familiarizing itself with the business of the debtor and had granted numerous requests for relief).

Debtor argues that the value of the estate is most likely maximized by administering the case in Massachusetts near a major media market. This argument is unpersuasive. Due to the nature of Debtor's business, which has been primarily conducted online and often remotely, as well as technological advances over the past few years in virtual conferencing, Debtor's proximity to media contacts in New York and Boston appears to be less important. Despite having media contacts in New York and Boston, Cartier chose to establish its headquarters in South Carolina rather than in Massachusetts and was able to operate its business from South Carolina without being in close proximity to those media contacts. Debtor failed to present evidence demonstrating why it was now important to be closely located to those media markets. Maintaining venue in this district does not prohibit Debtor from operating its business going forward in Massachusetts.

29

Debtor has failed to demonstrate that venue in Massachusetts would promote the most efficient and economic administration of the bankruptcy estate.

    **e.** *Necessity for Ancillary Administration*

Courts have only rarely given significant weight to the inquiry regarding possible ancillary administration in venue determinations. *See Hermitage*, 2019 WL 2536075, at *14 (citing cases). When they do, they focus on the location of the debtor's assets. *Id.* When the assets are comprised of real estate assets, it makes sense that the court with the most familiarity with the market would be the court in the location of those assets. *Id.* (concluding that because the debtors' assets consist almost entirely of real estate holdings in Vermont, and a successful non-sale reorganization is uncertain, the Vermont bankruptcy court's knowledge and familiarity with the local market and Vermont law favors venue in Vermont). In this case, Debtor's most valuable assets appear to be computer equipment and intangible property in the form of programming content and a streaming platform located on that computer equipment. The same local concerns associated with the sale of real estate assets in the event of a liquidation do not appear to be present in the context of the liquidation of computer equipment and intangible property. The testimony indicated that the only requirement for Debtor to operate its business providing the streaming platform on its servers was a reliable high speed internet connection, and its business could be operated from anywhere. Debtor has failed to demonstrate that this factor supports venue in Massachusetts.

For the foregoing reasons, the Court concludes that the application of the CORCO factors to this case confirms that this Court is the most appropriate forum for Debtor's bankruptcy case.

    **V.**     **The Interests of Justice Support Venue in South Carolina**

When determining whether the interests of justice support venue under Rule 1014, courts have considered the following factors:

(1) Whether transfer would promote the economic and efficient administration of the estate;
(2) Whether the interests of judicial economy would be served by the transfer;
(3) Whether either forum has an interest in having the controversy decided within its borders;
(4) Whether the parties would be able to receive a fair trial in each of the possible venues;
(5) Whether the enforceability of any judgment would be affected by the transfer; and
(6) Whether plaintiff's original choice of forum should be disturbed.

*Hermitage*, 2019 WL 2536075, at *15 (citing *In re Dunmore Homes, Inc.*, 380 B.R. 663, 672

(Bankr. S.D.N.Y. 2008)).

In considering the CORCO factors, the Court has previously addressed whether the transfer

of venue would promote the economic and efficient administration of the estate and concluded that

this factor favors venue in South Carolina. As discussed above, the Court similarly concluded that

the interests of judicial economy would best be served by venue in this district. Moreover, the

Court further observes that there is no indication from the evidence that Massachusetts state law

would govern any dispute or legal issue in this case, which would support venue in Massachusetts.

*See id.* (noting that "courts considering the question of venue have taken into account the frequency

with which interpretation of state law is likely to arise in contested matters, and this has been

viewed as especially important in deciding the venue of a bankruptcy case."). Since Debtor no

longer maintains a presence in South Carolina, only recently registered to do business in

Massachusetts, and has only one employee who often moves around and works remotely from

whatever residence he is occupying at the time, it does not appear that either forum has a significant

interest in having the case decided in that forum. The nature of Debtor's business does not favor

one venue over another. Accordingly, the Court finds that this factor is neutral.

Neither Debtor nor the Petitioners has claimed that they are more likely to have a fair

proceeding in one venue over the other. The record does not reflect any evidence supporting a

conclusion that one venue is more fair than another. This factor is also neutral. In addition, no

party has argued that one venue would be better for the purpose of the enforceability of judgments. Since Debtor appears to own no real property in either venue, this factor is neutral.

Regarding Debtor's choice of forum, the Court previously determined, as discussed above, that under the circumstances of this case, Debtor's choice of forum should not be dispositive. After operating a business in South Carolina for over two years, Debtor should not be surprised that it would be required to pursue bankruptcy relief in South Carolina. The mere location of Debtor's servers in Massachusetts, coupled with its eve of bankruptcy (nearly simultaneous) registration to do business in Massachusetts, do not establish a sufficient nexus to that state to justify deference to Debtor's choice of forum when the overwhelming weight of the evidence indicates that Debtor's principal place of business was in South Carolina up until the Involuntary Case was filed. While Cartier testified that he intended to relocate Debtor's operations to Massachusetts after Sanders' resignation on November 10, 2022, the evidence did not corroborate this testimony.

This case is similar to *In re Patriot Coal*, where the debtor incorporated two new entities in New York just weeks prior to the petition date, which allowed 97 other affiliates located across the country to file for bankruptcy in New York pursuant to 28 U.S.C. § 1408(2). 482 B.R. 718, 743 (Bankr. S.D.N.Y. 2012). When making its interest of justice analysis under 28 U.S.C. § 1412, the court considered the debtors' "purposeful creation of the venue-predicate affiliates in New York on the eve of filing," and found that it could not "allow the Debtors' venue choice to stand, as to do so would elevate form over substance in [a] way that would be an affront to the purpose of the bankruptcy statute and the integrity of the bankruptcy system." *Id.* at 744.

After considering all of the foregoing interest of justice factors, the Court finds that the factors weigh in favor of venue of the bankruptcy cases in South Carolina.

## <u>CONCLUSION</u>

For the reasons set forth above, it is hereby

**ORDERED** that the Motion is granted and the Court hereby determines pursuant to Fed. R. Bankr. P. 1014(b) that it serves both the convenience of the parties and the interests of justice for the Involuntary Case and the Voluntary Case to proceed in South Carolina;

**IT IS FURTHER ORDERED** that the Involuntary Case is adjudicated and relief is ordered;

**AND IT IS FURTHER ORDERED** that the two cases are hereby consolidated and will proceed under Chapter 11 under C/A No. 23-00438-EG, and the parties are directed to file all future pleadings in this case.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**03/31/2023**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 03/31/2023